## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

ALAN DORSEY,

Defendant.

No. 4:22-CR-00092

(Chief Judge Brann)

### MEMORANDUM OPINION

### AUGUST 29, 2023

Alan Dorsey has filed several motions related to criminal proceedings against him for the distribution of controlled substances and the unlawful possession of a firearm and ammunition. The indictment in this matter covers two events: (1) an alleged drug transaction between Dorsey and an unidentified confidential informant ("CI") working with the Pennsylvania State Police ("PSP") and (2) a traffic stop that led to the recovery of drugs and a firearm from bags owned by Dorsey, who was a passenger in the stopped vehicle.

Dorsey seeks to suppress evidence seized as a result of the traffic stop. During the stop, Dorsey refused to provide his last name to PSP Trooper Michael Cook. He eventually provided a fake name, and when confronted, fled. He was ultimately apprehended, and contraband was found inside his bags.

Dorsey also seeks to sever the indictment against him to separate the charge related to the alleged drug transaction and those related to the contraband found

during the traffic stop. He wishes to testify in his own defense with respect to the transaction with the CI but not as to the contraband recovered during the traffic stop. Lastly, he seeks to compel the Government to reveal the identity of the CI. For the following reasons, the Court denies all of Dorsey's motions.

## I.   BACKGROUND

### A.   Underlying Facts

#### 1.   The June 3, 2021 Drug Transaction[1]

On June 3, 2021, the PSP used a confidential informant to purchase $200 worth of methamphetamine from Dorsey in Bellefonte Borough, Centre County, Pennsylvania.[2] On Dorsey's instruction, the CI drove to meet Dorsey in a parking lot.[3] A PSP Trooper observed the transaction.[4] Another Trooper personally identified Dorsey as he left the transaction in a gray Hyundai SUV.[5]

---

[1]   The Government offers a recitation of the facts surrounding the June 3, 2021 transaction from "police reports, laboratory reports, and other information" in its possession. Severance Opp., Doc. 49 at 2 n.1. However, it has not provided said reports or information to the Court. Nor has Dorsey. In any event, the Court is satisfied with the facts it can glean from both parties moving papers and briefs.

[2]   Severance Opp., Doc. 49 at 2. The CI and Dorsey communicated via Facebook messenger. CI Opp., Doc. 48 at 2.

[3]   Severance Opp., Doc. 49 at 2.

[4]   *Id.* at 2-3.

[5]   *Id.*

## 2.    The September 11, 2021 Traffic Stop[6]

On September 11, 2021, PSP Trooper Cook began to follow a Silver Honda Accord.[7] He observed the Accord cross onto the double yellow centerline that separates lanes of opposite traffic three times in violation of 75 Pa. C.S. § 3313(d), which provides that drivers should drive on the right half of the roadway.[8]

Trooper Cook initiated a traffic stop.[9] Upon approaching the vehicle's driver side window, Trooper Cook explained to the driver, Grayson Blake, why he pulled over the vehicle and requested Blake's license, registration, and insurance.[10] As Blake searched for his documents, Trooper Cook asked Dorsey, who was in the passenger seat, for his name.[11] Dorsey refused to provide his last name, asking why Cook needed it and then asked if he could leave the traffic stop to go to his house nearby.[12] Trooper Cook explained he was "making conversation" and directed Dorsey to remain in the vehicle.[13] and asked Blake to exit the car to stand next to

---

[6]   In the record before the Court is a transcript of hearing the Court conducted for the purposes of Dorsey's motion, *see* Doc. 62, as well as a video recording from Trooper Cook's police cruiser, *see* Doc. 33-3. Trooper Cook was the only witness to testify at the suppression hearing. The Court finds him to be credible witness.

[7]   Doc. 33-3 at 21:53:51.

[8]   Hearing Tr., Doc. 62 at 13:20-15:14. Although the dashcam footage only shows Blake crossing onto, but not over, the centerline twice, the Court finds credible Trooper Cook's testimony that Blake crossed onto the line a third time prior to the dashcam recording. *See id.* at 15:20-16:11.

[9]   Doc. 33-3 at 21:54:45.

[10]  *Id.*

[11]  *Id.* at 21:55:54.

[12]  *Id.*

[13]  *Id.* at 21:56:39.

Cook's patrol car's passenger side window while he assessed Blake's documentation.[14]

While running Blake's information, Trooper Cook asked Blake about how he knew Dorsey and if Dorsey had outstanding warrants.[15] Blake referred to Dorsey as one of his friends.[16] When Trooper Cook asked Blake about the origin of Blake and Dorsey's trip, Blake gave somewhat inconsistent answers.[17] Cook then again requested Dorsey's last name from Blake.[18] Blake hesitated and would not give an answer, expressing that he referred to Dorsey as "Al."[19] Trooper Cook then asked Blake about Blake's prior criminal history and ran Blake's name for any outstanding warrants, finding only a summary warrant for fishing without a license.[20] Blake continued to insist that he was not intoxicated and would submit to a sobriety test.[21] He also expressed that he knew "what was going on" and wasn't partaking in any illegal activity.[22]

Trooper Cook asked if there was anything illegal in the vehicle and requested to search it.[23] Blake insisted that there wasn't.[24] Trooper Cook then requested to

---

[14] *Id.*
[15] *Id.* at 21:57:00.
[16] *Id.* at 21:57:03.
[17] *Id.* at 21:57:36.
[18] *Id.* at 21:57:54.
[19] *Id.* at 21:58.
[20] *Id.* at 21:59:09.
[21] *See id.*
[22] *See id.*
[23] *Id.* at 22:00:07.
[24] *Id.* at 22:00:30.

search the vehicle and Blake initially consented to the search.[25] Blake expressed that he would prefer that Cook not search the vehicle and inquired about Cook's reason for searching it.[26] Cook responded that Blake was free to refuse consent but that Cook was concerned about Dorsey because neither Dorsey nor Blake would give Dorsey's last name.[27] Cook again confronted Blake about Dorsey's last name, to which Blake responded that Cook would have to ask Dorsey.[28]

Cook then attempted to confirm with Blake that Blake was refusing consent to search the vehicle.[29] At that point, Dorsey, who was still seated in Blake's vehicle, stuck his head out of the passenger-side window and attempted to speak to Cook.[30] Cook exited his police cruiser and informed Blake that Blake could refuse consent, but Cook could call for a canine unit and then obtain a search warrant if the canine unit alerted to the presence of illegal substances.[31] Blake again protested that he was not intoxicated.[32] Cook explained that Blake gave an inconsistent story about where he and Dorsey came from and neither he nor Dorsey would give Dorsey's last name.[33]

---

[25] *Id.* at 22:00:30. While there is dispute over whether Blake truly consented to the search, this is not a relevant to Dorsey's case.
[26] *Id.* at 22:01.
[27] *Id.* at 22:01:10
[28] *Id.* at 22:01:24.
[29] *Id.* at 22:01:50.
[30] *Id.* at 22:01:56.
[31] *Id.* at 22:02:58.
[32] *Id.* at 22:03.
[33] *Id.* at 22:03:48.

Dorsey again asked if he could exit the vehicle and go to his home.[34] Cook explained that Dorsey was part of a traffic stop and not able to leave.[35] Cook further explained that he was discussing Blake's rights with Blake and the two would be able to leave soon.[36] Cook returned to Blake who then consented to the search of the vehicle.[37] On Cook's instruction, Dorsey exited the vehicle holding a handbag and a sweatshirt.[38] Dorsey protested, and Cook informed him that he was not under arrest but could not leave the traffic stop.[39] Dorsey told Cook that he did not have any weapons on him but refused to be patted down.[40] Dorsey refused to allow Cook to search his belongings, but Cook insisted that Dorsey leave his items on the hood of the Honda Accord because Cook did not know what was inside the bag.[41] Dorsey retrieved another bag from inside the car that he claimed was his and refused to allow Cook to search it.[42] Dorsey continued to protest, asserting that he was free to leave the traffic stop.[43] Cook refused to allow him to leave and insisted that he leave his items on the roof of the vehicle.[44]

---

[34] *Id.* at 22:03:51.
[35] *Id.* at 22:04.
[36] *Id.* at 22:04:24.
[37] *Id.* at 22:04:38.
[38] *Id.* at 22:06:40.
[39] *Id.* at 22:06:50.
[40] *Id.* at 22:07:15.
[41] *Id.* at 22:07:46.
[42] *Id.* at 22:07:55.
[43] *Id.* at 22:08:37
[44] *Id.* at 22:08:57.

Another officer arrived at the scene to assist Trooper Cook in searching the Honda Accord.[45] After completing the search, Trooper Cook again asked for Dorsey's name and Dorsey again refused.[46] Dorsey continued to argue with Cook, insisting that he had no part in the motor vehicle violation and should be allowed to leave.[47] Cook suggested that he could write Dorsey a ticket for not wearing a seatbelt while riding in the Accord.[48] Dorsey expressed that Cook could write the ticket, but insisted that he was wearing his seatbelt.[49] Cook again requested Dorsey's last name.[50] The two continued to argue, and when Cook asked again, Dorsey gave the false name of "Albert Dudley."[51]

Trooper Cook conducted a search on that false name, and upon finding no match to Dorsey, confronted Dorsey and demanded his last name.[52] Dorsey subsequently fled the scene, and was apprehended, arrested, and identified by the officers.[53] Trooper Cook then conducted a search of Mr. Dorsey's bags before placing them in his vehicle.[54] He recovered a "ghost gun," ammunition, fentanyl,

---

[45] *Id.* at 22:10:25.
[46] *Id.* at 22:15:30.
[47] *Id.* at 22:15:30.
[48] *Id.* at 22:15:35.
[49] *Id.* at 22:15:58.
[50] *Id.* at 22:16:03.
[51] *Id.* at 22:16:34.
[52] *Id.* at 22:19:45.
[53] *Id.* at 22:20:58.
[54] *Id.* at 22:28:38.

methamphetamine, and other drug paraphernalia that Dorsey now seeks to suppress.[55]

### B.     Procedural History

Through an indictment, the Government charges Dorsey with distribution of methamphetamine (Count I) and possession with intent to distribute controlled substances (Count II) in violation of 18 U.S.C. § 841(a)(1).[56] The Government additionally charges Dorsey with the unlawful possession of ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1) (Count III) and possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c) (Count IV).[57]

Dorsey moves to suppress any evidence recovered as a consequence of the September 11, 2021 traffic stop.[58] He also moves to compel the Government to disclose the identity of the CI from the June 3, 2021 transaction[59] and sever the indictment, allowing for separate trials of the offenses stemming from the June transaction and those stemming from the September traffic stop.[60]

---

[55]   Doc. 33 ¶ 9.
[56]   Doc. 1.
[57]   *Id.*
[58]   Doc. 33.
[59]   Doc. 35.
[60]   Doc. 37.

## II.    DISCUSSION

### C.    Motion to Sever Counts

"There is a preference in the federal system for joint trial of defendants who are indicted together."[61] Rule 8(a) of the Federal Rules of Criminal Procedure facilitates that preference by "allowing the government to advance multiple charges against multiple defendants in a single indictment" when those charges "arise out of a common series of acts or transactions."[62]

"Although joinder is authorized by Rule 8(a), factual information adduced before or during trial may indicate that joint trial of the counts might be unfair to the defendant."[63] Rule 14 provides the remedy:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

But "[m]ere allegations of prejudice are not enough; and it is not sufficient simply to establish that severance would improve the defendant's chance of acquittal."[64] Instead, a defendant "must demonstrate clear and substantial prejudice" that would "result[] in a manifestly unfair trial" if joinder is permitted.[65] Where a

---

[61] *United States v. Avila*, 610 F. Supp. 2d 391, 394 (M.D. Pa. 2009) (Conner, J.) (quoting *Zafiro v. United States*, 506 U.S. 534, 537 (1993)).

[62] *Id.*

[63] *United States v. Thomas*, 610 F.2d 1166, 1169 (3d Cir. 1979).

[64] *United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir. 1981) (citing *United States v. Kelley*, 635 F.2d 778, 780-81 (10th Cir. 1980)).

[65] *Id.* (citing *United States v. Herrera*, 584 F.2d 1137, 1143 (2d Cir. 1978)).

defendant wishes to testify in his defense to one count but not another, as Dorsey does here, severance is only required "where the 'defendant makes a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other."[66] "In order to make such a showing, 'it is essential that the defendant present enough information regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other to satisfy the court that the claim of prejudice is genuine.'"[67]

Dorsey asserts that he wishes to testify in his own defense with respect to Count I but not with respect to Counts II through IV.[68] He believes that "his opportunity for a fair hearing would be compromised and indeed prejudiced if all matters were presented before a jury at the same time."[69] He asserts that "there are elements of Counts II through IV that are irrelevant to the issue(s) to be decided by a jury with respect to Count I."[70]

The Government argues that Dorsey fails to present any information to support his desire to testify with respect to Count I and not Counts II through IV.[71] The Court agrees. The only relevant argument Dorsey makes is that evidence

---

[66] *Reicherter*, 647 F.2d at 401 (quoting *Baker v. United States*, 401 F.2d 958, 977 (D.C. Cir. 1968)).
[67] *Id.*
[68] Severance Br., Doc. 38 at 3.
[69] *Id.*
[70] *Id.*
[71] Severance Opp., Doc. 49 at 7.

relevant to Counts II through IV will be irrelevant to Count I. That in no way meets the high standard required by Rule 14. Accordingly, Dorsey's motion to sever will be denied.

### D.    Motion to Disclose CI

The Government retains a qualified privilege to "withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law."[72] In order to overcome the privilege, a defendant must set forth "a specific need for disclosure."[73] Then, the reviewing court "should balance 'the public interest in protecting the flow of information against the individual's right to prepare his defense,' which will depend on "the particular circumstances of the case, 'taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.'"[74]

"The Government may be required to disclose an informant's identity when '(1) the [informant's] possible testimony was highly relevant; (2) it might have disclosed an entrapment; (3) it might have thrown doubt upon the defendant's identity; and (4) the informer was the sole participant other than the accused, in the

---

[72]  *United States v. Jiles*, 658 F.2d 194, 196 (3d Cir. 1981) (quoting *Roviaro v. United States*, 353 U.S. 53, 59 (1957).
[73]  *Id.*
[74]  *Id.* (quoting *Roviaro*, 353 U.S. at 62).

transaction charged.'"[75] But "mere speculation as to the usefulness of the informant's testimony to the defendant is insufficient to justify disclosure of his identity."[76]

Here, Dorsey expects that the Government will rely on the CI at trial to prove Count I as the CI "was the only person alleged to have personally met with Defendant for a drug transaction on June 3, 2021."[77] Dorsey asserts that the "law enforcement personnel alleged to have assisted with Count I did not meet [him], nor are there any photographs, audio recordings, text messages, emails, or any other alleged electronic communications that have been preserved to corroborate whatever testimony will be offered at trial by the sole eyewitness, namely the 'Confidential Informant.'"[78] Dorsey therefore maintains that the CI's identity is "essential" to his defense.[79]

The Government responds that a law enforcement witness also saw the drug transaction relevant to Count I and personally identified Dorsey and will testify if necessary.[80] The Government therefore argues that disclosure is unnecessary because Dorsey has failed to advance a specific need for the evidence.[81]

---

[75] *United States v. Rivera*, 524 F. App'x 821, 827 (3d Cir. 2013) (quoting *Jiles*, 658 F.2d at 198-99).

[76] *United States v. Bazzano*, 712 F.2d 826, 839 (3d Cir.1983) (en banc).

[77] CI Br. Doc. 36 at 2.

[78] *Id.*

[79] *Id.* at 3.

[80] CI Opp., Doc. 48 at 7; Severance Opp., Doc. 49 at 5.

[81] *See* CI Opp., Doc. 48 at 3-7.

The Court agrees with the Government. Dorsey's argument amounts to nothing more than speculation that the CI will be useful in his defense. As the Government notes, this Court has repeatedly denied motions based on that argument.[82] Dorsey's argument about the lack of corroborative evidence is a matter for cross-examination. Accordingly, his motion to compel the disclosure of the CI's identity will be denied.

### E.   Suppression of the Evidence Collected Following the September 11, 2021 Traffic Stop

Dorsey challenges both the stop itself and Cook's extension of the stop. The Court discusses each in turn.[83]

### 1.   The Legality of The Traffic Stop

Dorsey first challenges the legality of the traffic stop itself. Cook premised the stop on Blake's alleged commission of a traffic violation, specifically of 75 Pa.

---

[82]   *See id.* at 5-6 (collecting cases)

[83]   The Court briefly addresses two additional arguments Dorsey makes. First, Dorsey argues that the evidence from the stop should be suppressed because he did not receive a *Miranda* warning despite Cook telling him that he was not free to leave. *See* Suppress Br., Doc. 34 at 6-7. That argument is without merit. *Miranda* does not apply to any police-imposed restriction in movement. *See Maryland v. Shatzer*, 559 U.S. 98, 113 (2010); *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984). Instead, it "comes into play during a traffic stop 'as of the moment [the suspect is] formally placed under arrest.'" *United States v. Ley*, 876 F.3d 103, 109 (3d Cir. 2017) (alteration in original) (quoting *Berkemer*, 468 U.S. at 434). Dorsey was not arrested until he fled the traffic stop. Second, Dorsey argues that the post-arrest search of his bags was unlawful because he was already apprehended and could not access them. Suppress Br., Doc. 34 at 16. But as the Government notes, the United States Court of Appeals for the Third Circuit has held that "when a valid arrest has been made in a public place, which requires that the arrested person be transported from the scene, police may search any luggage that the person has in his possession at the time of the arrest, and which must accompany him to the police station, prior to transporting it" in order to ensure that the officers can safely transport the arrestee's belongings. *United States v. Matthews*, 532 F. App'x 211, 224 (3d Cir. 2013). Accordingly, Dorsey's second argument is also meritless.

C.S. § 3301, which states: "Upon all roadways of sufficient width, a vehicle shall be driven upon the right half of the roadway."[84]

A traffic stop constitutes a "seizure" of "persons" within the meaning of the Fourth Amendment and is therefore "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."[85] The United States Court of Appeals for the Third Circuit explains that, generally, a police officer's decision to stop an automobile is considered to be reasonable when the officer has probable cause or a "reasonable, articulable suspicion that criminal activity is afoot."[86] But the officer "need not be factually accurate in [their] belief" that a violation had occurred, but "need only produce facts establishing that [they] reasonably believed that a violation had taken place.[87] These facts must be "specific" and "articulable."[88] An officer's reasonable mistake of fact does not violate the Fourth Amendment.[89]

Dorsey challenges the propriety of the traffic stop based on the Pennsylvania courts' interpretation of the relevant motor vehicle laws.[90] He primarily relies on *Commonwealth v. Brodhead*, a 2014 decision from the Honorable John A. Boccabella of the Court of Common Pleas of Berks County, Pennsylvania.[91] In

---

[84]   75 Pa. C.S. 3313(d).

[85]   *Whren v. United States*, 517 U.S. 806, 810 (1996).

[86]   *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006) (citing *Terry v. Ohio*, 392 U.S 1 (1968)).

[87]   *Id.* at 398.

[88]   *Id.*

[89]   *Id.*

[90]   Dorsey Suppl. Br., Doc. 63 at 10-12.

[91]   2014 WL 12466585 (Pa. Com. Pl. July 11, 2014).

*Brodhead*, a local police officer pulled over an SUV at night after he observed it "cross over the center dotted yellow lines twice" and "over the white berm line once" while "there was no opposing traffic."[92]

Judge Boccabella considered whether the officer had reasonable suspicion to initiate a traffic stop for violation of § 3301(a), the same section that Trooper Cook relied upon when stopping Blake's vehicle.[93] First, Judge Boccabella noted that the defendant had crossed over the white dotted center line that sits between lanes going in the same direction rather than the line that divides lanes going in opposite directions.[94] He also noted that the officer did not testify to observing the driver engage in "erratic" behavior.[95] Judge Boccabella then concluded that the stop was impermissible under *Commonwealth v. Gleason*, where the Supreme Court of Pennsylvania "addressed the issue of assessing when an officer has sufficient indicia of erratic driving to give the officer probable cause to stop a vehicle."[96] He found the case to be indistinguishable from *Gleason*, where court "concluded that, 'given the early morning hour, the fact that there was no other traffic on the roadway and

---

[92]  *Id.* at *1.
[93]  *Id.* at *3.
[94]  *Id.* at *4. The roadway in question was a four-lane highway. *Id.*
[95]  *Id.*
[96]  *Id.* (citing 785 A.2d 983 (Pa. 2001)).

the rather momentary nature of the defendant's vehicle crossing the fog line, . . . the officer erred in believing he had justification to stop the defendant's vehicle.'"[97]

But this case is distinguishable from both *Brodhead* and *Gleason* because there were other vehicles on the road when Blake crossed onto the yellow centerline. While Trooper Cook followed Blake, multiple other vehicles can be seen on the other side of the two-lane roadway. That creates a potential safety hazard given Blake's crossing onto the yellow centerline. Although the traffic was by no means heavy, the lack of traffic on the opposing lane was a significant fact in both *Brodhead* and *Gleason*.[98]

The other cases Dorsey cites in support are likewise distinguishable. In *Commonwealth v. Garcia*, the Superior Court of Pennsylvania interpreted *Gleason* to preclude a stop "where a vehicle is driven outside the lane of traffic for just a momentary period of time and in a minor manner" but noted that the touchstone of the *Gleason* inquiry is whether the driver presents a danger to others.[99] The *Garcia* court therefore reversed the trial court's denial of a suppression motion because the officer only saw the defendant cross over the *right* boundary of the roadway twice in apparent response to cars in the opposite lane over a distance of two blocks.[100]

---

[97] *Id.* (quoting 785 A.2d at 985-86) (alterations in original). Judge Boccabella further concluded that there could be no perceived violation of § 3301(a) because the defendant never left the right side of the roadway, which was two lanes in width. *See id.* at *5.

[98] *See* 785 A.2d at 989.

[99] 859 A.2d 820, 822-23 & n.3 (Pa. Super. Ct. 2004) (citing *id.* at 988).

[100] *Id.* at 823.

Here, Blake can be seen crossing onto the centerline *to his left*, approaching the opposite lane of traffic, on which there were other vehicles going the opposite direction. Therefore, the Court concludes that Trooper Cook had reasonable suspicion to initiate a traffic stop of Blake's vehicle for violating § 3301(a).

### 2.    The Extension of the Traffic Stop

Dorsey next challenges Cook's extension of the traffic stop to search his vehicle as unreasonable because Cook had no reasonable suspicion of criminal activity to justify said extension.[101]

"Though a stop may be lawful at its inception . . . it could become unreasonable, and thus violate the Constitution's proscription, at some later time."[102] "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop, and attend to related safety concerns."[103] A traffic stop is unreasonably extended when "an officer, without reasonable suspicion, diverts from [the] stop's traffic-based purpose to investigate other crimes."[104]

To determine whether a stop was unreasonably extended, the Court proceeds in a two-stage inquiry. First, it must determine if and when the traffic stop was

---

[101]   Dorsey Suppl. Br., Doc. 63 at 12-19.
[102]   *United States v. Clark*, 902 F.3d 404, 409 (3d Cir. 2018) (internal quotations omitted).
[103]   *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citations and quotations omitted).
[104]   *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018).

measurably extended, referred to as the "*Rodriguez* moment."[105] Second, it must assess whether the facts available to the officer at the *Rodriguez* moment were sufficient to establish reasonable suspicion of criminal activity.[106]

Any break in the mission of the traffic stop before the discovery of evidence that gives rise to reasonable suspicion will taint the stop.[107] "[U]nrelated inquiries resulting in even a *de minimis* extension [of the stop] are unlawful if not supported by reasonable suspicion."[108] But an officer may ask unrelated questions "so long as those inquiries do not measurably extend the duration of the stop."[109]

"Determining the relatedness of any given action to the basic mission of investigating a traffic violation requires assessing whether the action was something ordinarily incident to a traffic stop."[110] Actions such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" are examples "of inquiries incident to a traffic stop."[111] Courts can also "consider the 'legitimate and weighty' interest in officer safety," which "tolerate[s] additional intrusions, such as

---

[105] *United States v. Hurtt*, 31 F.4th 152, 159 (3d Cir. 2022).
[106] *Id.*
[107] *Id.*
[108] *Id.* at 160.
[109] *Rodriguez*, 575 U.S. at 355 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).
[110] *Hurtt*, 31 F.4th at 160 (internal quotation marks omitted).
[111] *Green*, 897 F.3d at 179 (citing *Rodriguez*, 575 U.S. at 355).

forcing a driver to get out of a vehicle."[112] That interest, "[u]nlike a general interest in criminal enforcement, . . . stems from the mission of the stop itself."[113]

Dorsey argues that the *Rodriguez* moment occurred when Cook instructed Blake to exit the vehicle and began to question him about Dorsey.[114] Dorsey challenges Cook's additional inquiries as off mission because Cook had the information necessary to issue a traffic citation before he began asking Blake about Blake's relationship with Dorsey.[115] Dorsey acknowledges that he failed to give his last name prior to Cook's questioning of Blake but avers that his failure to identify himself does not support reasonable suspicion on Cook's part.[116] He argues that he "had no obligation to provide his name or engage at all with Cook" under *United States v. Horsford*, a decision by my colleague, the Honorable Malachy E. Mannion, writing for this Court.[117]

In *Horsford*, Judge Mannion confronted a traffic stop under circumstances similar to those presented here. Two PSP troopers stopped a vehicle for speeding.[118] They initiated a traffic stop and informed the driver that he was speeding and had defunct license plate lights.[119] After receiving the driver's documentation, one

---

[112] *Id.* at 160 (quoting *Rodriguez*, 575 U.S. at 356).

[113] *Id.* (quoting *Rodriguez*, 575 U.S. at 356).

[114] Dorsey Suppl. Br., Doc. 63 at 17.

[115] *Id.* at 18 (arguing that Dorsey's failure to identify himself the first time and immediate request to leave the traffic stop "do[] not move Cook's needle forward" because Cook "did not demand his last name and had no mission-oriented purpose in asking it.").

[116] *Id.*

[117] *Id.*; *see* 2022 WL 2177447 (M.D. Pa. June 16, 2022).

[118] 2022 WL 2177447, at *3.

[119] *Id.*

trooper began to ask the driver about the origin of his trip, where he was staying during the trip, and when he purchased the vehicle.[120] The trooper then informed the driver that he would receive a warning and directed the driver to accompany him to his patrol car to receive the warning.[121] While the trooper prepared the warning, he continued to ask the driver questions regarding the trip.[122] Meanwhile, the trooper's partner was asking the passenger questions.[123] The troopers then cross-referenced the passenger's and driver's stories and concluded that they were inconsistent.[124] One of the troopers went to the passenger and asked additional questions to confirm the purported inconsistencies.[125] The troopers met again to discuss the answers to the follow-up questions and ultimately asked to search the vehicle.[126]

Judge Mannion applied the same *Rodriguez* inquiry the Court applies here.[127] In Judge Mannion's view, the *Rodriguez* moment occurred when the trooper asked the driver to exit the vehicle and speak to him near the patrol car.[128] Judge Mannion concluded that the trooper "strayed from the original mission of the traffic stop by separating the defendants in order to begin a drug investigation by questioning them about their activities and looking for inconsistencies in order to create reasonable

---

[120] *Id.* The vehicle had temporary license plates and had been recently registered. *See id.* at *2.
[121] *Id.* at *4.
[122] *Id.* *4-5.
[123] *Id.*
[124] *Id.* at *5.
[125] *Id.*
[126] *Id.* at *6. Ultimately, the troopers requested a canine unit, which alerted to the presence of drugs in the vehicle. *See id.* at *6-7.
[127] *See id.* at *9.
[128] *Id.* at *10.

suspicion to support the resulting delay in the stop and the subsequent canine sniff."[129] Judge Mannion also concluded that the other trooper's questioning of the passenger was unrelated to the stop because the passenger had "no obligation to answer any questions or even speak to the troopers."[130]

Whether a passenger is legally obligated to speak to police officers or identify themselves during a traffic stop is a debatable legal question following *Rodriguez*.[131] As is the case with many Fourth Amendment restrictions, the Court is loath to issue bright-line rules. But here, the Court need not reach that question. Whether Cook's request for Dorsey's last name is related or unrelated to the mission of the traffic stop, merely asking the question did not measurably extend the stop.[132] Cook asked the question while Blake was searching for his information. Dorsey simply

---

[129] *Id.*

[130] *Id.*

[131] *See United States v. Offord*, 788 F. App'x 384, 386 (7th Cir. 2019) ("An officer may demand identification and information from passengers and can order passengers to get out of the car during the stop." (citing *United States v. Muriel*, 418 F.3d 720, 726 (7th Cir. 2005))); *United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019) (concluding that "[a] demand for a passenger's identification is not part of the mission of a traffic stop" as "[t]he identity of a passenger . . . will ordinarily have no relation to a driver's safe operation of a vehicle."). Many pre-*Rodriguez* cases also held that a passenger is subject to questions and requests for identification during a traffic stop. *See United States v. Soriano-Jarquin*, 492 F.3d 495, 499-500 (4th Cir. 2007); *United States v. Rodriguez-Hernandez*, 353 F.3d 632, 635 (8th Cir. 2003); *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007). There is no suggestion that the Third Circuit has adopted the bright-line rule that *Landeros* appears to create and therefore the Court is not bound by such a rule.

[132] *See United States v. Forget*, 853 F. App'x 534, 539 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 471 (2021) (finding that an officer's unrelated request to search the car did not measurably extend the traffic stop because "it occurred simultaneously with [the officer's] inquiries into [the driver's] identification").

responded by asking Cook why needed that information and Cook offered that he was just making conversation. The entire exchange took about ten seconds.[133]

Although the length of the inquiry did not change the nature of the stop, its substance did. As Dorsey refused to answer the question, Cook was faced with a late-night traffic stop of two individuals, one of whom refused to identify himself and immediately sought permission to leave the traffic stop. The Court concludes that a reasonably prudent person in those circumstances would be warranted in believing that his safety or that of others was in danger. [134] Despite Dorsey's argument to the contrary, several courts have considered an individual's refusal to identify himself and attempts to leave to support an officer's reasonable suspicion of criminal activity.[135]

---

[133] Doc. 33-3 at 21:55:53-56:53.

[134] *See Maryland v. Wilson*, 519 U.S. 408, 414 (1997) ("[D]anger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car.").

[135] *See United States v. Campbell*, 549 F.3d 364, 372 (6th Cir. 2008) (holding that passenger's failure to provide identification, "possibly to conceal his identity," was factor that could be considered in determining whether pat-down during *Terry* stop was appropriate); *United States v. Mouscardy*, 722 F.3d 68, 75 (1st Cir. 2013) (finding that defendant's repeated failure to identify himself contributed to officer's reasonable suspicion, justifying a frisk); *Machado v. Weare Police Dep't*, 494 F. App'x 102, 106 (1st Cir. 2012) (finding that "a basis for continuing the *Terry* stop had plainly been established" in part because the passenger's "refus[al] to give his full name which would allow a radio check to see whether he was wanted"); *Poole v. Flanery*, 162 F. App'x 661, 662 (8th Cir. 2006) (noting that the officer "did not violate [the plaintiff's] Fourth Amendment rights by approaching the car, given its position, or by further questioning [him], given the undisputed evidence that [he] initially refused to give his name, subsequently provided a false name, and was unable to provide proof of insurance."); *Robinson v. Sweeney*, 2022 WL 912208, at *3 (E.D. Wis. Mar. 29, 2022) (finding officer had reasonable suspicion of criminal activity when suspect failed to identify himself multiple times); *Commonwealth v. Reed*, 19 A.3d 1163, 1170 (Pa. Super. Ct. 2011) (affirming trial court's denial of suppression motion in part because officer had reasonable suspicion when defendant "initially refused to identify himself, then offered an unverifiable alias, and finally gave his real name"); *State v. Grasty*, 2005 WL 3148072, at *2 (Minn. Ct. App. Nov. 22, 2005) ("[The

Some of those cases involved more suspicious circumstances than those presented here. But they also involved more significant intrusions following the individual's failure to identify themselves, like frisks for weapons or a full-blown arrest. Here, Cook didn't frisk or arrest Dorsey following his refusal to fully identify himself and attempt to leave the traffic stop. He instead took the less intrusive step of separating Blake and Dorsey and asking Blake about his travel plans, which "ordinarily fall within the scope of a traffic stop."[136] But even if they do not, the Court concludes that Cook had reasonable suspicion to question Blake about his travel plans based on Dorsey's failure to identify himself. Blake's answers to those questions were inconsistent with his location when Cook began to observe him.

Cook also asked Blake about his relationship with Dorsey and for Dorsey's last name. The Court finds this inquiry also supported by Dorsey's refusal to give his last name. Blake hesitated and then claimed not to know Dorsey's last name,

---

officer acted reasonably under the circumstances because of appellant's evasive behavior and the fact that from [his] experience, individuals who are unwilling to provide identifying information are probably hiding something."); *State v. Parfait*, 831 So. 2d 360, 367 (La. Ct. App. 2002) (finding officer had reasonable suspicion where defendant "acted evasively in that she refused to give her name to [the officer]" and "thereafter . . . attempted to leave the scene"); *In re E.S.*, 2021 WL 5937155, at *4 (Cal. Ct. App. Dec. 16, 2021) ("Finally, and perhaps most importantly in the totality of the circumstances calculus, [the defendant] fails to account for his refusal to properly identify himself, which was significant because it was evasive conduct rather than a crime in itself.").

[136] *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003) (citing *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001)). In addition, under the Supreme Court of the United States' decision *Pennsylvania v. Mimms*, "a police officer may as a matter of course order the driver of a lawfully stopped car to exit his vehicle." *Wilson*, 519 U.S. at 410 (citing *Mimms*, 434 U.S. 106 (1977)). The *Mimms* Court's "legitimate and weighty" justification for its decision was officer safety, which clearly applies in these circumstances involving a late-night traffic stop of two individuals. *Id.* (quoting *Mimms*, 434 U.S. at 110).

despite twice claiming that he and Dorsey were friends. The Court finds both of those limited lines of inquiry a permissible extension of the traffic stop given Dorsey's refusal to identify himself and Cook's need to know who he was dealing with to be safe. Blake's answers to both inquiries further increased the likelihood that either Blake or Dorsey were engaged in criminal activity, justifying further extension of the stop, which ultimately led to Dorsey's arrest.

Accordingly, the Court finds *Horsford* distinguishable. There, the officers didn't develop reasonable suspicion to extend the stop until after they spoke to the driver and passenger separately and perceived inconsistencies in their stories. Additionally, it appears that the passenger freely spoke to one of the officers in *Horsford* and answered all the officer's questions.[137] It also appears that he remained in the car and never attempted or requested to leave.[138] Here, Dorsey's failure to provide his last name provided limited but sufficient grounds to extend the stop *before* Cook separated the two and began an unrelated line of questioning. Accordingly, Dorsey's motion to suppress will be denied.

---

[137] *See* 2022 WL 2177447 at *5.
[138] *See id.*

## III.   CONCLUSION

For the foregoing reasons, Dorsey's motions are denied.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge